1
2
3
4
5
6
7
8                      UNITED STATES DISTRICT COURT

9              FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   SHAWN OWEN NELSON,                     No.  2:24-cv-0693 AC

12                 Plaintiff,

13        v.                                **ORDER**

14   COMMISSIONER OF SOCIAL
     SECURITY,
15
                   Defendant.
16

17

18        Plaintiff seeks judicial review of a final decision of the Commissioner of Social Security

19   ("Commissioner"), denying his application for disability insurance benefits ("DIB") under Title II

20   of the Social Security Act ("the Act"), 42 U.S.C. §§ 401-34.[1]  For the reasons that follow,

21   plaintiff's motion for summary judgment will be GRANTED, and defendant's cross-motion for

22   summary judgment will be DENIED.

23                          I.  PROCEDURAL BACKGROUND

24        Plaintiff applied for DIB on December 28, 2021, alleging that the disability onset date was

25   February 26, 2021.  Administrative Record ("AR") 17.[2]  The application was disapproved

26   _____

27   [1]  DIB is paid to disabled persons who have contributed to the Disability Insurance Program, and
     who suffer from a mental or physical disability.  42 U.S.C. § 423(a)(1); Bowen v. City of New
     York, 476 U.S. 467, 470 (1986).
28   [2]  Two copies of the AR are electronically filed as ECF Nos. 10-1 to 10-2 (AR 1 to AR 638).

1    initially on April 8, 2022, and on reconsideration on June 1, 2022.  Id.  On March 14, 2023, ALJ

2    Thomas Sanzi presided over the online video hearing on plaintiff's challenge to the disapprovals.

3    AR 34-76 (transcript).  Plaintiff, who appeared with his counsel Jeffrey Milam, was present at the

4    hearing.  AR 34.  Mark Anderson, a Vocational Expert ("VE"), also testified at the hearing.  AR

5    34, 64.

6        On April 12, 2023, the ALJ found plaintiff "not disabled" through June 30, 2021,

7    plaintiff's date last insured ("DLI") under Sections 216(i) and 223(d) of Title II of the Act, 42

8    U.S.C. §§ 416(i), 423(d).  AR 17-29 (decision), 30-33 (exhibit list).  On January 17, 2024, after

9    receiving Exhibit 13B, a Request for Review dated June 8, 2023, and Exhibit 12E, a

10   Representative Brief dated November 21, 2023, as additional exhibits, the Appeals Council

11   denied plaintiff's request for review, leaving the ALJ's decision as the final decision of the

12   Commissioner of Social Security.  AR 1-5 (decision and additional exhibit list).

13       Plaintiff filed this action on March 6, 2024.  ECF No. 1; see 42 U.S.C. § 405(g).  The

14   parties consented to the jurisdiction of the magistrate judge.  ECF Nos. 6, 8.  The parties' cross-

15   motions for summary judgment, based on the Administrative Record filed by the Commissioner,

16   have been briefed.  ECF Nos. 11 (plaintiff's summary judgment motion), 13 (defendant's

17   summary judgment motion).  Plaintiff has also filed a reply brief in support of his motion.  ECF

18   No. 14.

19                                II.  FACTUAL BACKGROUND

20       Plaintiff was born on November 7, 1982, and accordingly was, at age 38, a younger

21   individual under the regulations both on June 30, 2021, his DLI, and when he applied for DIB on

22   December 28, 2021.  AR 17, 19, 28; see 20 C.F.R. §§ 404.1563(d), 416.963(c).  Plaintiff has a

23   high school education, has finished at least four years of college, and can communicate in

24   English.  AR 28, 227.  Plaintiff worked as a Wal-Mart floor associate from 2005 to 2008, a trainer

25   for a "[t]emp agency for Verizon" from 2008 to 2010, a Best Buy sales representative from 2010

26   to 2013, an AT&T salesman from 2014 to 2015, and an Apple customer service representative

27   from August 2016 to January 2017.  AR 228.

28   ////

1        III.  LEGAL STANDARDS

2        The Commissioner's decision that a claimant is not disabled will be upheld "if it is

3   supported by substantial evidence and if the Commissioner applied the correct legal standards."

4   Howard ex rel. Wolff v. Barnhart, 341 F.3d 1006, 1011 (9th Cir. 2003).  "'The findings of the

5   Secretary as to any fact, if supported by substantial evidence, shall be conclusive . . ..'"  Andrews

6   v. Shalala, 53 F.3d 1035, 1039 (9th Cir. 1995) (quoting 42 U.S.C. § 405(g)).

7        Substantial evidence is "more than a mere scintilla," but "may be less than a

8   preponderance."  Molina v. Astrue, 674 F.3d 1104, 1110-11 (9th Cir. 2012).  "It means such

9   evidence as a reasonable mind might accept as adequate to support a conclusion."  Richardson v.

10  Perales, 402 U.S. 389, 401 (1971) (internal quotation marks omitted).  "While inferences from the

11  record can constitute substantial evidence, only those 'reasonably drawn from the record' will

12  suffice."  Widmark v. Barnhart, 454 F.3d 1063, 1066 (9th Cir. 2006) (citation omitted).

13  Although this court cannot substitute its discretion for that of the Commissioner, the court

14  nonetheless must review the record as a whole, "weighing both the evidence that supports and the

15  evidence that detracts from the [Commissioner's] conclusion."  Desrosiers v. Secretary of HHS,

16  846 F.2d 573, 576 (9th Cir. 1988); Jones v. Heckler, 760 F.2d 993, 995 (9th Cir. 1985) ("The

17  court must consider both evidence that supports and evidence that detracts from the ALJ's

18  conclusion; it may not affirm simply by isolating a specific quantum of supporting evidence.").

19       "The ALJ is responsible for determining credibility, resolving conflicts in medical

20  testimony, and resolving ambiguities."  Edlund v. Massanari, 253 F.3d 1152, 1156 (9th

21  Cir. 2001).  "Where the evidence is susceptible to more than one rational interpretation, one of

22  which supports the ALJ's decision, the ALJ's conclusion must be upheld."  Thomas v. Barnhart,

23  278 F.3d 947, 954 (9th Cir. 2002).  However, the court may review only the reasons stated by the

24  ALJ in his decision "and may not affirm the ALJ on a ground upon which he did not rely."  Orn

25  v. Astrue, 495 F.3d 625, 630 (9th Cir. 2007); Connett v. Barnhart, 340 F.3d 871, 874 (9th Cir.

26  2003) ("It was error for the district court to affirm the ALJ's credibility decision based on

27  evidence that the ALJ did not discuss").

28       The court will not reverse the Commissioner's decision if it is based on harmless error,

3

which exists only when it is "clear from the record that an ALJ's error was 'inconsequential to the ultimate nondisability determination.'" Robbins v. Soc. Sec. Admin., 466 F.3d 880, 885 (9th Cir. 2006) (quoting Stout v. Commissioner, 454 F.3d 1050, 1055 (9th Cir. 2006)); see also Burch v. Barnhart, 400 F.3d 676, 679 (9th Cir. 2005).

## IV.  RELEVANT LAW

Disability Insurance Benefits and Supplemental Security Income are available for every eligible individual who is "disabled." 42 U.S.C. §§ 402(d)(1)(B)(ii) (DIB), 1381a (SSI).  Plaintiff is "disabled" if he is "'unable to engage in substantial gainful activity due to a medically determinable physical or mental impairment . . ..'" Bowen v. Yuckert, 482 U.S. 137, 140 (1987) (quoting identically worded provisions of 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A)).

The Commissioner uses a five-step sequential evaluation process to determine whether an applicant is disabled and entitled to benefits.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); Barnhart v. Thomas, 540 U.S. 20, 24-25 (2003) (setting forth the "five-step sequential evaluation process to determine disability" under Title II and Title XVI.  The following summarizes the sequential evaluation:

> Step one: Is the claimant engaging in substantial gainful activity?  If so, the claimant is not disabled.  If not, proceed to step two.

20 C.F.R. § 404.1520(a)(4)(i), (b).

> Step two: Does the claimant have a "severe" impairment?  If so, proceed to step three.  If not, the claimant is not disabled.

Id. §§ 404.1520(a)(4)(ii), (c).

> Step three: Does the claimant's impairment or combination of impairments meet or equal an impairment listed in 20 C.F.R., Pt. 404, Subpt. P, App. 1?  If so, the claimant is disabled.  If not, proceed to step four.

Id. §§ 404.1520(a)(4)(iii), (d).

> Step four: Does the claimant's residual functional capacity [RFC] make him capable of performing his past work?  If so, the claimant is not disabled.  If not, proceed to step five.

Id. §§ 404.1520(a)(4)(iv), (e), (f).

> Step five: Does the claimant have the residual functional capacity perform any other work?  If so, the claimant is not disabled.  If not,

4

1    the claimant is disabled.

2    Id. §§ 404.1520(a)(4)(v), (g).

3        The claimant bears the burden of proof in the first four steps of the sequential evaluation

4    process.  20 C.F.R. §§ 404.1512(a) ("In general, you have to prove to us that you are blind or

5    disabled"), 416.912(a) (same); Bowen, 482 U.S. at 146 n.5.  However, "[a]t the fifth step of the

6    sequential analysis, the burden shifts to the Commissioner to demonstrate that the claimant is not

7    disabled and can engage in work that exists in significant numbers in the national economy."  Hill

8    v. Astrue, 698 F.3d 1153, 1161 (9th Cir. 2012); Bowen, 482 U.S. at 146 n.5.

9                            V.  THE ALJ's DECISION

10       The ALJ made the following findings:

11           1. The claimant last met the insured status requirements of the Social
             Security Act on June 30, 2021.
12

13           2. The claimant did not engage in substantial gainful activity during
             the period from his alleged onset date of February 26, 2021 through
             his date last insured of June 30, 2021 (20 CFR 404.1571 et seq.).
14

15           3. Through the date last insured, the claimant had the following
             severe  impairments:  bilateral  Achilles  tendinitis;  left  knee
             osteoarthritis status post arthroscopic surgery; obesity; mood
16           disorder  (bipolar/major  depressive  disorder),  attention  deficit
             hyperactivity disorder (ADHD), generalized anxiety disorder, and
17           posttraumatic stress disorder (PTSD) (20 CFR 404.1520(c)).

18           4. Through the date last insured, the claimant did not have an
             impairment or combination of impairments that met or medically
19           equaled the severity of one of the listed impairments in 20 CFR Part
             404, Subpart P, Appendix 1 ["Appendix 1"] (20 CFR 404.1520(d),
20           404.1525 and 404.1526).

21           5. After careful consideration of the entire record, [ALJ found] that,
             through the date last insured, the claimant had the residual functional
22           capacity to perform light work as defined in 20 CFR 404.1567(b)
             except can stand and walk 2 hours in an 8-hour day.  The claimant
23           can frequently push and pull with the bilateral lower extremities.  He
             can never climb ladders, ropes, and scaffolds.  He can occasionally
24           stoop, crouch, kneel, and crawl.  He can have no exposure to
             unprotected heights.  The claimant can perform simple, routine,
25           tasks.  He can perform low stress jobs, defined as those having only
             occasional decision making required and only occasional changes in
26           the  work  setting.  He  can  have  occasional  interaction  with
             supervisors, coworkers, and the public.  The claimant is limited to
27           jobs that can be performed while using a cane that is required only
             for prolonged ambulation or uneven terrain.

28

                                    5

6. Through the date last insured, the claimant was unable to perform any past relevant work (20 CFR 404.1565).

7. The claimant was born on November 7, 1982 and was 38 years old, which is defined as a younger individual age 18-49, on the date last insured (20 CFR 404.1563).

8. The claimant has at least a high school education (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 CFR 404.1569 and 404.1569a).

11. The claimant was not under a disability, as defined in the Social Security Act, at any time from February 26, 2021, the alleged onset date, through June 30, 2021, the date last insured (20 CFR 404.1520(g)).

AR 19-29.

As noted, the ALJ concluded that plaintiff was "not disabled" under Title II of the Act. AR 29.

## VI. ANALYSIS

A. <u>The ALJ Did Not Err in Evaluating Plaintiff's Testimony Regarding Pain and Physical Dysfunction</u>

During the hearing, plaintiff testified about chronic pain in his ankles and left knee. AR 46. He stated that he dislocated the knee when he was younger, and that he has a calcium ingrowth that he has to have surgically removed every so often. AR 46. As for his ankles, plaintiff testified that he was still recovering from surgery on the right ankle on December 8, 2022, which addressed both bone spurs and a detached Achilles tendon. AR 48. Plaintiff expected to have surgery on the left ankle after recovering from this surgery. AR 48.

Plaintiff asserted he could only stand for fifteen minutes at a time. AR 51. He needed a cane to walk anywhere outside the house, per podiatrist Dr. Dennis Hum's prescription, and could

1  not run or jog.  AR 46-47.  Plaintiff originally said he only started needing his cane that

2  frequently after his December 2022 surgery, but then said he has needed it since 2015.  AR 52.

3       The ALJ found that although plaintiff had "a long history of left knee pain… this was well

4  treated with arthroscopic surgery and exams do not reveal left knee instability as alleged."  AR

5  24.  The ALJ also found that plaintiff had "a long history of bilateral heel and ankle pain… with

6  diagnosis of Achilles tendinitis."  AR 25.  The December 2022 surgery, however, kept the pain in

7  his right ankle "controlled" to the point that plaintiff is planning the same surgery on the left

8  ankle.  AR 25-26.  Based on plaintiff's response to treatment, the ALJ found that "clinical exam

9  findings were not strongly adverse overall."  AR 26.  He concluded that plaintiff's "left knee and

10  bilateral Achilles conditions" support some precautions like the use of a cane, but any further

11  restrictions in the record were short-term recovery tactics rather than longitudinal ones.  AR 26.

12  In sum, the ALJ credited some of plaintiff's testimony but not his claims of a disabling level of

13  pain.

14       In the Ninth Circuit, evaluating a claimant's testimony as to pain is a two-step process.

15  First, the claimant must provide "objective medical evidence of an underlying impairment 'which

16  could reasonably be expected to produce the pain or other symptoms alleged.'"  Garrison v.

17  Colvin, 759 F.3d 995, 1014 (9th Cir. 2014) (quoting Lingenfelter v. Astrue, 504 F.3d 1028,

18  1035–36 (9th Cir. 2007) (quoting Bunnell v. Sullivan, 947 F.2d 341, 344 (9th Cir.1991))).  The

19  claimant need not, however, provide evidence that the impairment would result in the same

20  degree of pain or other symptom as what the claimant alleges.  Garrison, 759 F.3d at 1014.

21       Second, if the claimant succeeds in providing objective evidence of the impairment and

22  "there is no evidence of malingering," the ALJ cannot reject the claimant's testimony about the

23  severity of such symptoms unless there is "'specific, clear and convincing reasons for doing so.'"

24  Id. at 1014-15 (quoting Smolen v. Chater, 80 F.3d 1273, 1281 (9th Cir. 1996)).  The clear and

25  convincing standard is "not an easy requirement to meet" and is in fact the most demanding

26  standard in such cases.  Garrison, 759 F.3d at 1015.

27       While an ALJ's credibility finding must be properly supported and sufficiently specific to

28  ensure a reviewing court the ALJ did not "arbitrarily discredit" a claimant's subjective

1    statements, an ALJ is also not "required to believe every allegation" of disability.  Fair v. Bowen,

2    885 F.2d 597, 603 (9th Cir. 1989); Smartt v. Kijakazi, 53 F.4th 489, 499 (9th Cir. 2022).[3]

3    Although an ALJ cannot reject complaints of pain solely due to "a lack of medical evidence

4    to *fully corroborate* the alleged severity of pain[,]"  it need not adopt such testimony when it

5    contradicts "objective medical evidence in the record[.]"  Id. at 498-99 (quoting Burch, 400 F.3d

6    at 680).  Evaluating the "intensity and persistence" of the symptoms of an impairment will

7    involve considering all available evidence, including "medical history, the medical signs and

8    laboratory findings, and statements about how…symptoms affect" the plaintiff.  20 C.F.R. §

9    404.1529(a).  Relevant factors include:

> (ii) The location, duration, frequency, and intensity of your pain or other symptoms; […]
>
> (iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms;
>
> (v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms; [and]
>
> (vi) Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.);

17         20 C.F.R. § 404.1529(c).  As to the fourth and fifth factors, the Ninth Circuit has held that

18   an ALJ can consider "unexplained, or inadequately explained, failure to seek treatment or follow

19   a prescribed course of treatment."  Bunnell v. Sullivan, 947 F.2d 341, 346 (9th Cir. 1991)

20   (quoting Fair v. Bowen, 885 F.2d 597, 603 (9th Cir. 1989)); see also Plummer v. Berryhill, Case

21   No. 2:16-cv-00753-AC, 2017 U.S. Dist. LEXIS 108184 at *16-17, 2017 WL 2972461 at *6 (E.D.

22   Cal. July 12, 2017) (agreeing with the ALJ that "failure to pursue recommended treatment

23   discredited…[plaintiff's] subjective testimony.").

24         Here plaintiff argues that the ALJ improperly discounted evidence of his symptoms over

---

[3]  In this regard, so long as substantial evidence supports an ALJ's credibility finding, a court "may not engage in second-guessing."  Thomas v. Barnhart, 278 F.3d 947, 958 (9th Cir. 2002). Defendant argues that the clear and convincing standard in Garrison conflicts with this "substantial evidence" standard, as articulated in 42 U.S.C. § 405(g).  ECF No. 13 at 7, n.3; 759 F.3d at 1015.  Defendant conflates the evidentiary burden the ALJ must meet in its decision with the standard of review that courts must apply when analyzing such decisions.

the two years preceding his December 2022 surgery, including his allegations of pain from

February 2021.  ECF No. 11 at 13 (citing AR 467).  Surgery followed a series of unsuccessful

treatments, and plaintiff was still not weightbearing the month after the surgery.  ECF No. 11 at

13 (citing AR 467, 479, 502, 541).  Plaintiff further argues that the ALJ erred in requiring that

plaintiff's allegations of chronic pain be supported by evidence of subpar ankle strength,

notwithstanding other evidence of ankle dysfunction.  ECF No. 11 at 13-14 (citing AR 26, 479,

605).  Finally, plaintiff contends that the lack of supporting evidence from a physical examination

does not justify discounting his testimony as to symptoms.  ECF No. 11 at 14.

Defendant argues as an initial matter that any medical evidence before February 2021 or

after June 2021 has no probative value, and that plaintiff's failure to cite evidence from this

period is fatal to his argument.  ECF No. 13 at 11 (citing Johnson v. Shalala, 60 F.3d 1428, 1432

(9th Cir. 1995)).  In Title II cases, the operative question is whether the plaintiff "was either

permanently disabled or subject to a condition which became so severe as to disable…[him] *prior*

*to* the date upon which…[his] disability insured status expires."  Johnson, 60 F.3d at 1432

(emphasis added).  The ALJ acknowledged that plaintiff "must establish disability on or before

that date in order to be entitled to a period of disability and disability insurance benefits."  AR 17.

Plaintiff replies that because he stopped working in January 2017 due to his conditions,

evidence predating his application remains probative if it postdates the onset of his conditions.

ECF No. 14 at 2 (citing Pacheco v. Berryhill, 733 Fed. Appx. 356, 360 (9th Cir. 2018)).  This

does not explain why medical evidence from after his June 2021 DLI would be relevant.  At

minimum, the Ninth Circuit has held that medical evidence predating the alleged onset date is "of

limited relevance."  Pacheco, 733 Fed. Appx. at 360 (citing Carmickle v. Commissioner of the

Social Security Administration, 533 F.3d 1155, 1165 (9th Cir. 2008) (citing Fair v. Bowen, 885

F.2d 597, 600 (9th Cir. 1989))).

In any case, as defendant and the ALJ note, the question is whether plaintiff was disabled

on or before June 30, 2021.  See AR 17; Johnson, 60 F.3d at 1432.  To the extent that physical or

mental pain is relevant to that question, "objective medical evidence of an underlying

impairment" is most probative if it precedes this date.  See Garrison, 759 F.3d at 1014 (internal

1    citations omitted).  In this context, the ALJ's reasons for discounting plaintiff's testimony are

2    legally sufficient.

3        As to his left knee, plaintiff underwent arthroscopy on February 26, 2021 to remove an

4    intra-articular loose body.  AR 318, 325, 335.  Dr. Kelley Booth advised that plaintiff could put

5    his full body weight on the knee and only needed crutches for comfort.  AR 335-36.

6    Postoperative instructions included keeping his leg above his heart to minimize swelling, but Dr.

7    Booth reserved judgment on whether he would need physical therapy.  AR 336-37.  On March 10,

8    2021, Dr. Neel Gupta reported that plaintiff was "[o]verall doing well[.]" AR 325.

9        On April 27, 2021, Dr. Surinder Singh noted that plaintiff had missed postoperative

10   physical therapy sessions after his arthroscopy without scheduling a follow-up, yet plaintiff stated

11   that the pre-operative pain and "catching" in his knee were resolved.  AR 318.  Plaintiff was

12   "doing very well" and in fact did not want subsequent physical therapy, opting to instead continue

13   the "meniscectomy protocol" from home.  AR 318-19.  There was a healing abrasion on his knee,

14   but no signs of infection or effusions.  AR 318.  He had intact neurovascular findings and a range

15   of motion from 5 to 110 degrees.  AR 318.

16       On June 3, 2021, plaintiff complained to Dr. Noel Aparte of left knee pain.  AR 311-12.

17   He said it locked up and rated the pain as a 6 out of 10 when moving or bending.  AR 312.  Dr.

18   Aparte noted that an MRI from April 18, 2021 revealed two intraarticular joint bodies, consistent

19   with prior scans.  AR 312.  Those MRI results, however, predated plaintiff's April 27, 2021

20   assertion that he was doing well.  AR 312, 318-19.

21       Dr. Ridhika Kapur advised plaintiff to schedule an orthopedic follow-up on June 22.  AR

22   313.  As the ALJ notes, the record does not show that plaintiff ever did.  AR 25.  To the extent

23   that knee pain and locking returned in June 2021, his failure to follow the recommended course of

24   treatment undercuts the probative value of the pain testimony.  See AR 311-12; Bunnell, 947 F.2d

25   at 346; Plummer, 2017 U.S. Dist. LEXIS 108184 at *16-17, 2017 WL 2972461 at *6.

26       As for plaintiff's ankle, he visited Dr. Hum on March 4, 2020 for a follow-up appointment

27   based on ten years of chronic pain in his Achilles tendon.  AR 376.  Plaintiff reported arch pain in

28   the same foot.  AR 376.  Testing revealed that that all four quadrants of plaintiff's plantarflexors

had "5/5" strength.  AR 378.  Physical therapy thus far had not helped, but plaintiff was willing to try custom orthotics.  AR 376-77.  Dr. Hum diagnosed plaintiff with Achilles tendinitis and plantar fasciitis, and he advised plaintiff to continue physical therapy while adding stretching and icing.  AR 378.

On March 15, 2021, Dr. Hum wrote that plaintiff had reported significant improvement in his "plantar fascial pain[.]"  AR 320-21.  Plaintiff also reported ongoing Achilles pain, peaking from an 8 to 9 on a ten-point scale.  AR 321.  An MRI of the right ankle revealed tendinosis of "the Achilles tendon with large posterior calcaneal enthesophyte" and of "the peroneal tendons with possible focal interstitial tearing of the peroneal longus tendon."  AR 322.  Plaintiff nevertheless had intact epicritical sensation, "5/5 muscle strength in all 4 quadrants with smooth active and passive [range of motion] at the ankle[.]"  AR 322.  Dr. Hum provided plaintiff with "arch supports with heel support modifications" and "Achilles heel sleeves for protection while sleeping."  AR 322.

In May 2022, plaintiff requested replacement custom orthotics to treat the chronic pain in his Achilles tendon because his old pair was worn down.  AR 603.  The doctor noted that pain notwithstanding, the ankle showed no signs of swelling, redness, or weakness, and muscle strength was still rated five out of five.  AR 604.  In June 2022, plaintiff reported that he had no back pain and minimal pain in both heels, although his right always felt worse than his left.  AR 566.

Taken as a whole, the medical record as of the DLI does indicate tendinosis that could result in the alleged level of ankle pain.  AR 322.  Muscular performance of the ankle, however, was intact at the time and remained so through May 2022.  AR 322, 604; see Meanel v. Apfel, 172 F.3d 1111, 1114 (9th Cir. 1999) (ALJ permissibly rejected plaintiff's testimony that she had to "lie in a fetal position all day" because she "did not exhibit muscular atrophy or any other physical signs of an inactive, totally incapacitated individual.").  Plaintiff also managed the pain solely through physical therapy, arch supports, and heel sleeves from March 2021 through May 2022.  AR 322, 603, 605.  Plaintiff only pursued surgery, a "[r]ight [r]etrocalcaneal exostectomy with Achilles tendon reattachment and debridement[,]" in December 2022—almost six months

after the relevant period for determining disability.  AR 479, 502.  That he functioned with only "minimal, conservative treatment" through his DLI supports the ALJ's conclusion regarding the degree to which ankle pain affect's plaintiff's RFC.  See Meanel, 172 F.3d at 1114 (in discounting pain testimony, ALJ correctly contrasted the assertion that plaintiff "experienced pain approaching the highest level imaginable" against the fact that she obtained only "minimal, conservative treatment" for such pain.).  In any case, a January 2023 follow-up appointment revealed that the surgery was successful, predicted plaintiff could eventually put his full weight on it, and did not recommend any restrictions.  AR 467-68.

The ALJ did not err in the assessment of plaintiff's physical pain in his knee or ankle.

B.  The ALJ Erred in Discounting Plaintiff's Testimony Regarding The Severity of His Mental Health Symptoms

1.  Plaintiff's Testimony and ALJ Findings

Plaintiff's allegations of mental disability included "PTSD, bipolar, anxiety, panic disorder, agoraphobia, and anxiety talking to people in person or on the phone[.]"  AR 22, 226.  Of these, plaintiff testified that his most debilitating mental diagnosis is his panic attacks.  AR 56.  Their timing and frequency varied when he was working, but they have since occurred whenever he leaves the house.  AR 56.  They have happened at least two days a week in the three years before the hearing, often result in shortness of breath, and entirely prevent plaintiff from going to work or leaving the house on those days.  AR 57-58.  Dealing with others is the most common trigger.  AR 59.

Plaintiff also testified that he needs regular reminders to take medicine, has stopped reading despite it being a childhood past-time, and must rewatch movies or TV shows multiple times.  AR 61-62.  Plaintiff's concentration problems have cost him his driving license, he cannot participate in community events or his children's school programs, and even his children cannot participate in after-school activities because he would forget to pick them up.  AR 62-63.  Plaintiff also testified to depression that can be so debilitating, it prevented him from appealing the denial of his last application for benefits.  AR 63-64.

As to treatment, plaintiff testified that he began mental health treatment in 2015, has seen

psychiatrist Dr. Csilla Lippert since 2021, and has taken medication but never undergone inpatient psychiatric care. AR 49-51. The medication does influence his symptoms, but they "are still working on" it. AR 50.

The ALJ found that although plaintiff's impairments could cause the alleged symptoms, the evidence in the record did not support plaintiff's claims as to the "intensity, persistence and limiting effects of these symptoms[.]" AR 23. Because the alleged onset date and DLI were only four months apart, "creating a narrow time period for establishing disability[,]" the ALJ relied on longitudinal evidence throughout the record when assessing mental impairments. AR 23.

The ALJ noted that although plaintiff had a prior disability claim in September 2017 based on complaints of depression, anxiety, PTSD, and ADHD, he had since improved through medication and his RFC reflected any outstanding limitations. AR 23. Plaintiff had fewer obtrusive thoughts by March 2020 and was not as depressed by August 2020. AR 23. As of February 26, 2021, plaintiff "was less anxious, denied mood swings, was not as angry, and" kept busy. AR 23. As of a psychiatric visit in May 2021, plaintiff was sleeping okay, less anxious, less depressed, coping better, and having less dangerous ideation. AR 23.

The ALJ noted that although plaintiff's symptoms worsened between February 2022 and February 2023, he would sometimes miss medication dosages during this period. AR 23-24. Doctors added prescriptions, which plaintiff then admitted were helpful. AR 23-24. The ALJ concluded that outpatient medication management had yielded significant benefit. AR 24.

The ALJ also held that the results of clinical mental status exams were not strongly adverse. AR 24. Although plaintiff was generally anxious and depressed, less so in February and May 2021, he otherwise had normal eye contact, motor, speech gait, thought processes, insight, judgment, cognition, recent and remote memory, attention, concentration, language, and knowledge. AR 24. Although test scores in intelligence and memory were in the "low average" range in September 2017, the examiner did not find these results reflective of plaintiff's ability to complete tasks involving concentration or to remember tasks. AR 24.

The ALJ concluded that lingering symptoms of ADHD and difficulty in talking to others merited limiting plaintiff to simple routine tasks and only occasional social interaction. AR 24.

1  However, the effectiveness of routine treatment, the results of mental status exams, and the

2  frequency of panic attacks did not support an RFC requiring days off work.  AR 24.

3          2.  <u>Plaintiff's September 2017 Test Results Do Not Support a More Limited RFC</u>

4          Plaintiff asserts that his extremely low scores on a September 27, 2017 psychological

5  evaluation corroborate his allegations of disabling memory deficits.  ECF No. 11 at 18 (citing AR

6  289).  Defendant responds that in light of the administrating psychiatrist's analysis, plaintiff's

7  interpretation does not provide basis for remand because the ALJ's interpretation is also rational.

8  ECF No. 13 at 15 (citing <u>Burch</u>, 400 F.3d at 679).

9          Dr. Kelly Pham asserted that the results of plaintiff's examination were a good

10  representation of his neuropsychological functioning.  AR 286.  His scores on the WAIS-IV

11  yielded a Full-Scale IQ of Below Average.  AR 286-87.  Differences between WAIS-IV

12  subscores, however, suggested that plaintiff could follow verbal instructions better than he could

13  perform visual-spatial tasks.  AR 287-88.  Because plaintiff's Working Memory Index subscore

14  was in the Average range, Dr. Pham held that plaintiff would not struggle with tasks that require

15  concentration.  AR 288.  She attributed any perceived gaps in concentration or memory to

16  plaintiff's depression rather than any learning or amnestic disorder.  AR 288-89.

17          Plaintiff's WMS-IV scores showed that plaintiff's Immediate, Delayed, and Visual

18  Memory Indices were all Extremely Low, in the bottom two percentile.  AR 289.  However, this

19  was because plaintiff's Visual Reproduction subscores were Extremely Low while his other

20  scores were either Average or Low Average.  AR 289.  Because this was consistent with

21  plaintiff's WAIS-IV performance, Dr. Pham concluded plaintiff would not experience

22  "significant work-related deficits with remembering simple and/or complex tasks."  AR 289.

23          The ALJ's summary of plaintiff's September 2017 test results repeated Dr. Pham's

24  interpretation.  <u>See</u> AR 24, 289.  This contributed to the ALJ's conclusion that plaintiff's

25  objective exam findings as to memory deficits were not strongly adverse.  AR 24.  Plaintiff has

26  failed to articulate why this is not an acceptable interpretation of the results, particularly as Dr.

27  Pham distinguished between favorable and adverse results.  Plaintiff has not demonstrated that his

28  2017 examination results support his allegations of more severe dysfunction.

3.    The ALJ Erred in Rejecting Plaintiff's Testimony About the Severity of His

Mental Health Symptoms

Plaintiff contends that symptoms outlined in his medical records corroborate his allegations of mental dysfunction.  ECF No. 11 at 15-17 (citing AR 316, 347, 364-65, 370, 450, 455, 456, 465-66, 489, 515, 532, 546, 551, 556, 562, 570, 576, 589, 593, 607, 621, 627, 629, 633).  This record includes persistent observations of an "anxious mood and affect" consistent with agoraphobia, and anxiety attacks.  ECF No. 11 at 18 (citing AR 365, 455, 489, 515, 532, 551, 562, 576, 593, 629).

Plaintiff argues that the ALJ overstated his response to treatment by highlighting waxing and waning symptoms, a common phenomenon for those with bipolar disorder.  ECF No. 11 at 17 (citing Garrison, 759 F.3d at 1017-18; Attmore v. Colvin, 827 F.3d 872, 876 (9th Cir. 2016)).  He argues that some symptoms, like a compulsion to rip out his own toenails and a fear of leaving the house, never saw any material improvement.  ECF No. 11 at 18 (citing AR 364, 465, 484, 510, 545, 556, 607).  At minimum, plaintiff concludes, the ALJ lacks clear and convincing evidence that plaintiff no longer suffers from panic attacks or has difficulty being around others.  ECF No. 11 at 18 (citing Ghanim v. Colvin, 763 F.3d 1154, 1162 (9th Cir. 2014)).

Defendant notes as an initial matter that very little of plaintiff's cited evidence concerns the relevant period between February and June 2021.  ECF No. 13 at 15.  Defendant then argues that the evidence he cites of both mood-related findings and debilitating symptoms are from his own reports to physicians, which do not constitute "objective evidence."  ECF No. 13 at 16 (citing Ukolov, 420 F.3d at 1005-06).

Because "[c]ycles of improvement and debilitating symptoms are a common occurrence" for a mental disability, the ALJ cannot reject a plaintiff's testimony merely due to waxing and waning intensity of symptoms.  Garrison, 759 F.3d at 1017.  When a person "suffers from severe panic attacks, anxiety, and depression[,]" improvement does not necessarily mean that that the mental disability no longer affects the plaintiff's ability to function in the workplace.  Id. (citing Holohan v. Massanari, 246 F.3d 1195, 1205 (9th Cir. 2001)).  Symptoms must be interpreted in the context of the patient's overall well-being, with the understanding that symptoms that would

15

prevent someone from functioning in the workplace may not manifest "while being treated and while limiting environmental stressors[.]"  Garrison, 759 F.3d at 1017.  This degree of caution is especially merited when no medical expert has opined based on review of the full record that plaintiff can return to work.  Id.

Under this standard, defendant's attempt to limit the scope of relevant evidence fails. Plaintiff's condition between February and June 2021 remains most relevant, but limiting the analysis to evidence from this five-month period would fail to account for the impact of cyclical symptoms.  Meanwhile, plaintiff's self-reported symptoms may reflect his capacity to function in professional and everyday settings more accurately than clinical observations can.

In light of the record as a whole, including plaintiff's contemporaneous reports of symptoms and the longitudinal evidence overall, the court concludes that the ALJ failed to fully account for the waxing and waning of symptoms.  Plaintiff reported being depressed on March 31, 2020 but denied suicidal ideation.  AR 367.  During an August 10, 2020 visit, he admitted to suicidal ideation once a week and said he was no longer ripping out his own toenails, implying that he previously had been.  AR 364.  Dr. Riqueza Galura reported that plaintiff was anxious during his mental status examination, but also that he was less depressed and had no suicidal or homicidal ideation.  AR 365.

On February 18, 2021, plaintiff reported that he was no longer anxious and experienced even less suicidal ideation.  AR 347.  On May 19, 2021, he reported that he felt less anxious but did feel "down" for a few days and had poor memory.  AR 316.  These two reports reflect the only medical evidence dated between the alleged disability onset date and his DLI.

The year after the disability onset date, however, saw a drastic decline in plaintiff's mental health that never reversed.  In February 2022, plaintiff reported decreased sleep, spikes of rage and anger, and increased anxiety even though it was already high.  AR 626-27, 633.  During a February 24, 2022 visit, Dr. Lippert observed that plaintiff was anxious despite speaking normally and with a congruent tone.  AR 629.  Plaintiff's anxiety persisted as 2022 continued, and in April he began digging his toenails out to satisfy his need to always be doing something. AR 593, 616-17, 607-08.  He reported in June 2022 that the habit had improved, or at least not

16

worsened, but he was still depressed and continuously anxious.  AR 570, 576.  Plaintiff's

description of his anxiety symptoms in July and September 2022 matches his testimony at the

hearing, particularly the fact that just leaving the house can trigger it.  Compare AR 56 with AR

515, 555-56.  By February 2023, plaintiff's thoughts reportedly ranged from hiding in the closet

for hours to "death thoughts[.]"  AR 450, 466.  Dr. Lippert wrote that during the mental status

examination, plaintiff's mood was "not great" and his affect was anxious and sad.  AR 455.

As to treatment, the ALJ either overstates the efficacy of medication or understates the

degree of plaintiff's adjustments to medication.  See AR 23.  The ALJ does note that plaintiff's

failure to take medicine, which was sometimes deliberate, led to the observed resurgences in his

symptoms.  See AR 617.  In other instances, however, plaintiff's misplacement of pills or

forgetting to take them could itself reflect mental incapacities, particularly as plaintiff now

testifies to concentration issues.  See AR 61-62, 482, 484, 569-70.

In any case, plaintiff's physicians regularly needed to adjust his dosages due to

insufficient response.  Plaintiff started a trial prescription of aripiprazole in March 2020 for mood

stabilization.  AR 367.  When plaintiff reported increased irritability and difficulty sleeping in

February 2022, Dr. Lippert increased his trazodone dosage by 50%.  AR 633.  Plaintiff reported a

week later that this had just further decreased how much sleep he can obtain.  AR 626-27.  Dr.

Lippert and plaintiff questioned the correct dosage of atomoxetine and buspirone for his anxiety

in April and May 2022, respectively.  AR 589, 607.  In June 2022, Dr. Lippert noted

"[s]ignificant worsening in mood and organization in transition from atomoxetine to bupropion."

AR 576.  Plaintiff and Dr. Lippert agreed to try Adderall for a while and return to a prescription

of atomoxetine if Adderall did not help.  AR 576.

Plaintiff then found himself having to choose between treating his condition and avoiding

the negative side effects.  On August 3, 2022, plaintiff told Dr. Lippert that he had stopped taking

aripiprazole because it gave him hot flashes, but he was therefore angrier and had bigger mood

swings.  AR 545.  He also reported that he was ripping out his toenails again in the past couple of

weeks, and that an increased dose of Buspirone medication might not be helping.  AR 545-46.

The most recent medical records do not suggest any long-term improvement.  See AR 24

17

(citing AR 450-51, 456).  Plaintiff last visited Dr. Lippert on February 15, 2023, having emailed her the week before with concerns that this fluoxetine prescription was making him feel depressed and worthless.  AR 465-66.  During the February 15 mental status examination, Dr. Lippert categorized plaintiff's mood as "not great" and his affect as anxious and sad.  AR 455.  They agreed to start trying lithium to address his depression and mood instability, plus off-label memantine to address his nail-picking.  AR 456.  Plaintiff was also receptive to receiving further psychotherapy support.  AR 456.

Without record of a follow-up appointment after February 2023, whether the most recent medication regimen proved effective is unclear.  At minimum, the record supports plaintiff's testimony that he is still "working on" deciding what treatment works best.  AR 50.  That plaintiff was still making these adjustments over a year after his DLI, and almost two after his alleged onset date, shows that his mental conditions were not well-managed during the relevant period.  The ALJ accurately noted that plaintiff denied any history of inpatient psychiatric care.  AR 22, 49.  The ALJ does not, however, cite any evidence that he rejected inpatient care after a physician recommended it.  Although refusal of recommended treatment can discredit subjective testimony about the severity of plaintiff's symptoms, failure to independently pursue further treatment does not.  Cf. Plummer, 2017 U.S. Dist. LEXIS 108184 at *16-17, 2017 WL 2972461 at *6.

In light of plaintiff's agoraphobia and anxiety attacks, the ALJ limited plaintiff's RFC to "simple, routine[] tasks" in "low stress jobs" with only "occasional interaction with supervisors, coworkers, and the public."  AR 22-23.  However, these limitations are inconsistent with plaintiff's testimony that he risks triggering a debilitating, day-long panic attack just by leaving the house.  Because that testimony was wrongful rejected, remand for reevaluation is required.

      C.  The ALJ Erred in the Assessment of Medical Opinions

          1.  Standards for Evaluation of Medical Opinions

For any DIB application filed after 2017 changes to regulations, no medical opinion or administrative medical finding, including any submitted by the claimant, is given any specific evidentiary weight, such as controlling weight.  20 C.F.R. § 404.1520c(a).  Each opinion is instead evaluated based on supportability through objective medical evidence, consistency with

other medical and nonmedical sources, relationship with the claimant, specialization in the

relevant area, and other factors that seem to support or contradict the medical opinion.  20 C.F.R.

§ 404.1520c(c).  Of these, supportability and consistency are most important.  20 C.F.R. §

404.1520c(a).  "Relationship with the claimant" includes the length and purpose thereof, the

frequency of the examinations, the "kinds and extent of examinations and testing" by this expert,

and whether the expert personally examined the claimant as opposed to reviewing evidence in his

folder.  20 C.F.R. § 404.1520c(c)(3).

An ALJ decision must articulate how persuasive it found each opinion, but it need not

articulate how it considered every factor for every medical opinion.  20 C.F.R. § 404.1520c(b)(1).

If "a medical source provides multiple medical opinion(s)[,]" the ALJ need only specify how it

"considered the medical opinions…from that medical source together in a single analysis using

the factors" listed above.  Id.  Because supportability and consistency are the most important

factors, the ALJ must explain how it considered them but has discretion to discuss the other three

as appropriate.  20 C.F.R. § 404.1520c(b)(2).  When multiple opinions on one issue are equally

well-supported and consistent with the rest of the record, but not entirely consistent with each

other, the decision must articulate whichever combination of the remaining factors the ALJ

considered in deciding which opinion was the more persuasive.  20 C.F.R. § 404.1520c(b)(3).

## 2.  The ALJ Erred in Rejecting the Opinion of Dr. Kelly Pham

During his September 27, 2017 psychological evaluation by Dr. Pham, plaintiff reported

depression, anxiety-induced panic attacks, PTSD, ADHD that left him unable to concentrate, and

a learning disability like dyslexia that resulted in horrible memory.  AR 284.  Dr. Pham observed

that plaintiff talked quickly during the interview despite saying he was not anxious.  AR 286.  He

had an adequate fund of knowledge and capacity for abstraction, but limited attention,

concentration, and memory for recently learned information.  AR 286.  Although as discussed

above Dr. Pham found that plaintiff's memory deficits would not significantly impair his ability

to work, she found that plaintiff would have mild-to-moderate limitations in maintaining regular

attendance in the workplace, plus moderate limitations in performing work activities on a

consistent basis.  AR 290-91.  She also expected plaintiff to be "moderately to markedly limited"

in completing a normal workday or workweek without interruptions, interacting with others, and dealing with the usual level of stress encountered in a competitive work environment.  AR 291.

The ALJ found Dr. Pham's opinion relevant but not persuasive because the results of the exams "would be more of a snapshot in time" years before the alleged onset date.  AR 27.  He contrasted Dr. Pham's opinion regarding plaintiff's ability to complete complex tasks against notes from plaintiff's ADHD treatment showing limitations in that area.  AR 27 (citing AR 616).  Conversely, the ALJ also held that the efficacy of plaintiff's ADHD treatment and his ability to conduct daily activities like childcare undermines Dr. Pham's assertions of any limitations.  AR 27 (citing AR 316-17).

Plaintiff argues that Dr. Pham's opinion regarding limitations was still relevant because the ALJ failed to cite any evidence showing that his mental functioning had significantly improved since the 2017 examination.  ECF No. 11 at 23-24.  As to the ALJ's reference to childcare, plaintiff argues that the ALJ failed to identify specific childcare activities and explain how they reflect less-than-marked limitations.  Id. at 24 (citing Trevizo v. Berryhill, 871 F. 3d 664, 676 (9th Cir. 2017)).

Defendant responds that the record does contain findings of improved memory and attention/concentration, both before and during the relevant period.  ECF No. 13 at 20 (citing AR 286, 317, 347, 365).  Defendant further argues that at no point was the ALJ required to "draft dissertations" to explain itself when denying plaintiff's DIB application.  ECF No. 13 at 21 (citing Lambert v. Saul, 980 F.3d 1266, 1277 (9th Cir. 2020)).  Defendant cites plaintiff's own admissions regarding childcare, both to Dr. Pham and during the administrative hearing, and his love for reading as proof that countered Dr. Pham's assertions of extreme limitations.  ECF No. 13 at 21 (citing AR 50, 286, 549).

The Ninth Circuit held in Trevizo that the ALJ's rejection of the opinion of the plaintiff's treating physician was improper because, among other things, the ALJ did not articulate specific details about her childcare activities that contradicted the opinion.  871 F.3d at 676.  At the time of that holding, an ALJ who rejected the opinion of a treating physician needed to provide "specific and legitimate reasons that are supported by substantial evidence[.]"  Id. at 675 (quoting

20

1  Ryan v. Comm'r of Social Security, 528 F.3d 1194, 1198 (9th Cir. 2008) (quoting Bayliss v.

2  Barnhart, 427 F.3d 1211, 1216 (9th Cir. 2005))).  For claims filed after March 27, 2017, however,

3  federal regulations no longer give deference or controlling weight to the opinions of plaintiff's

4  medical sources.  Compare 20 C.F.R. § 404.1520c(a) with 20 C.F.R. § 404.1527(c)(2).  The Ninth

5  Circuit has since held that requiring an ALJ to articulate "specific and legitimate reasons" for

6  rejecting the opinions of treating physicians would improperly give such sources that level of

7  deference.  Woods v. Kijakazi, 32 F.4th 785, 792 (9th Cir. 2022).[4]

8         The strongest reason for discounting Dr. Pham's report is its inconsistency with

9  subsequent assessments of mental capacity.  On May 19, 2021, after a mental examination, Dr.

10  Galura wrote that plaintiff had "linear and goal-directed" thought processes, fair judgment, intact

11  recent and remote memory, and intact concentration.  AR 315, 317.  As defendant notes, Dr.

12  Galura had reached the same conclusion on August 10, 2020.  AR 365.  On February 18, 2021,

13  despite a diagnosis of bipolar disorder, ADHD, and anxiety, Dr. Galura again wrote that plaintiff

14  had "fair" insight and judgment.  AR 347.  This does reflect a more positive description of

15  plaintiff's attention, concentration, and memory than Dr. Pham's assessment almost three years

16  prior.  See AR 286.  Plaintiff does not explain why the ALJ should have prioritized Dr. Pham's

17  opinion over Dr. Galura's repeat assessments three years later.

18         However, the ALJ also relied on supposed inconsistencies with the record that are not

19  adequately explained.  For example, clinical notes from August 3, 2022, do show that plaintiff

20  "enjoy[ed] reading, computer technology, and spending quality time with family."  AR 544, 549.

21  However, the ALJ does not explains how these activities are inconsistent with the limitations

22  identified by Dr. Pham.  There is no obvious inconsistency.

23         More importantly, the ALJ partially bases his opinion on the discrepancy between Dr.

24  Pham's opinion and the "efficacy of treatment."  AR 27.  As discussed above, the ALJ drastically

25  overstated the efficacy of treatment, by failing to adequately account for both the need for

26  _____

27  [4] Plaintiff also cites Trevizo's holding that childcare duties allowed the plaintiff "to rest, take
naps, and shower repeatedly throughout the day, all of which would be impossible at a traditional
full-time job."  ECF No. 11 at 24 (citing 871 F.3d at 682).  The court made this observation as

28  part of its analysis of plaintiff's symptom testimony, not a medical opinion.  871 F.3d at 678, 682.

1    frequent changes to plaintiff's medication regime and the waxing and waning nature of his

2    symptoms.  See supra VI.B.2.  To the extent that the ALJ found Dr. Pham's opinion

3    "inconsistent" with the treatment history, the ALJ erred.

4              3.   The ALJ Erred in Rejecting the Medical Opinion of Dr. Lippert.

5              In a June 13, 2022 opinion, Dr. Lippert asserted that plaintiff had a moderate limitation in

6    his ability to understand, remember, and carry out one- or two-step instructions.  AR 417.  She

7    also reported a marked limitation in plaintiff's ability to concentrate; withstand the stress and

8    pressures of an eight-hour workday; understand, remember, and carry out technical and complex

9    job instructions; receive and carry out instructions from supervisors; and relate and interact with

10   coworkers.  AR 417.  Plaintiff's limitations in dealing with the public, on the other hand, were

11   likely extreme.  AR 417.  Dr. Lippert estimated that plaintiff would miss two-thirds of the days in

12   a work month due to his mental issues.  AR 417.  The report explains that while the impairment's

13   onset predates 2017, the symptoms had persisted even after intensive treatment.  AR 417.  At

14   best, Dr. Lippert expected 1-2 more years of impairment even with continued treatment.  AR 417.

15             The ALJ found this report unpersuasive, in part because Dr. Lippert did not start treating

16   plaintiff until 2022.  AR 27.  The opinion stated that aside from mood and affect, Dr. Lippert's

17   notes on plaintiff's condition were mostly consistent with a normal mental status.  AR 27.  It also

18   noted that Dr. Lippert does not provide rationale for specific limitations, and that plaintiff's denial

19   that he ever underwent inpatient care undercuts Dr. Lippert's claims of intensive treatment.  AR

20   27.  Patient notes reveal that plaintiff had individual outpatient sessions less than monthly, and

21   was only considered for a psychotherapy referral aside from this.  AR 27 (citing 630-31).  The

22   ALJ also found Dr. Lippert's opinion inconsistent with treatment notes by "another psychiatrist at

23   the time of the alleged onset date and date last insured indicating good benefit with medication[.]"

24   AR 27 (citing AR 316-17).

25             Plaintiff asserts that although Dr. Lippert only took over plaintiff's treatment from Dr.

26   Galura in 2022, she reviewed Dr. Galura's notes and therefore had the longitudinal knowledge

27   needed to provide an accurate opinion.  ECF No. 11 at 20-21.  Plaintiff also challenges the ALJ's

28   assertions that clinical notes identified only issues related to mood and affect.  Id. at 21.  He cites

1  references to plaintiff pulling his toenails out, being afraid to leave the house, and having suicidal

2  thoughts.  Id.  In any case, plaintiff argues, even the deficits in mood and affect can serve as

3  objective signs of disabling bipolar and anxiety disorders.  Id.

4       Plaintiff also argues that the level of treatment he received was consistent with Dr.

5  Lippert's assessment of his limitations.  Id.  He particularly questions why the ALJ felt that

6  records of inpatient hospitalization were necessary.  Id. (citing Matthews v. Astrue, No. EDCV

7  11–01075–JEM, 2012 WL 1144423, at *9, 2012 U.S. Dist. LEXIS 47903 at *24 (C.D. Cal. April

8  4, 2012); Armstrong v. Colvin, No. CV 12-7060-CW, 2013 WL 3381352, at *5, 2013 U.S. Dist.

9  LEXIS 96614 at *13-14 (C.D. Cal. July 8, 2013); Schiaffino v. Saul, 799 Fed. Appx. 473, 476

10  (9th Cir. Jan. 9, 2020)).  Plaintiff further argues that based on the medical records, the treatment

11  he received did not improve his symptoms.  Id. at 22.

12       Plaintiff's argument regarding Dr. Lippert's longitudinal experience lacks support.  The

13  relationship a medical source has with a claimant depends on the "[l]ength of the treatment

14  relationship" and "[f]requency of examinations" by that source.  20 C.F.R. § 404.1520c(c)(3)(1)-

15  (2).  These factors link a source's longitudinal understanding of impairments to the "length of

16  time a medical source has treated you" and "frequency of your visits *with the medical source*[,]"

17  respectively.  Id. (emphasis added).  This does not suggest that a medical source can substitute

18  another physician's hands-on experience for their own by reviewing notes.

19       In any event, as defendant argues, some of Dr. Galura's notes themselves undercut Dr.

20  Lippert's opinion—at least when read in isolation.  See ECF No. 13 at 19 (citing AR 317, 347,

21  417).  On May 19, 2021, after a mental examination, Dr. Galura wrote that plaintiff had "linear

22  and goal-directed" thought processes, fair judgment, intact recent and remote memory, and intact

23  concentration.  AR 315, 317.  On February 18, 2021, plaintiff reported that he was no longer

24  anxious and did not experience as much suicidal ideation as before.  AR 347.  Defendant argues

25  that while plaintiff's medication treatment may not have been conservative, the fact that it did

26  result in some improvement during the relevant period means this was harmless error.  ECF No.

27  13 at 19.

28       As discussed above, however, the ALJ and defendant have misinterpreted plaintiff's

medical and treatment history.  The three symptoms that plaintiff cites —fear of leaving the house, pulling toenails out, and suicidal ideation —were reported in August 2020 (AR 364-65) and resurfaced in April 2022, nine months after the date last insured (AR 607).  ECF No. 11 at 21.  This demonstrates that the symptoms were waxing and waning, and that the various adjustments to plaintiff's medication regimen did not prevent recurrence.  Isolated reports of improvement are therefore insufficient to discredit Dr. Lippert's conclusions.

Defendant next argues that the ALJ did not require inpatient treatment to find plaintiff disabled, but rather contrasted the lack of such treatment with Dr. Lippert's assertion of "intensive treatment[.]"  ECF No. 13 at 19; AR 27.  The Ninth Circuit, however, has repeatedly held that intensive treatment supporting a disability finding can take forms other than inpatient treatment.  The court in Schiaffino held that hospitalization is not necessary to show that certain mental health conditions are disabling.  799 Fed. Appx. at 476.  The court also found "questionable" the ALJ's holding that plaintiff should have seen a psychiatrist for help with a mental impairment more often than he already did.  Id. (quoting Nguyen v. Chater, 100 F.3d 1462, 1465 (9th Cir. 1996)).  The court in Armstrong, supra, similarly held that an ALJ cannot call treatment for a mental impairment "conservative" when plaintiff routinely sought treatment for her depression and took prescription medication for it.  2013 WL 3381352, at *5, 2013 U.S. Dist. LEXIS 96614 at *14.  Here, in contrast, by finding that plaintiff's treatment was not "intensive," the ALJ appears to have penalized plaintiff for having only "individual outpatient sessions less than monthly and… only consideration of referral for psychotherapy outside of these sessions[.]"  AR 27.  This characterization of plaintiff's treatment as conservative is erroneous.

Finally, defendant argues that the RFC adequately accounts for plaintiff's mental health conditions by limiting him to "low-stress jobs" that require "only occasional decision making…and…changes in the work setting" among other restrictions.  ECF No. 13 at 19; AR 21-22.  This does not render the error harmless.  Harmless error is found where "the ALJ's error, if any indeed existed, was inconsequential to the ultimate nondisability determination."  Stout v. Comm'r of Soc. Sec., 454 F.3d 1050, 1055 (9th Cir. 2006).  The "relevant inquiry… is not whether the ALJ would have made a different decision absent any error… it is whether the ALJ's

24

1   decision remains legally valid, despite such error." <u>Carmickle v. Comm'r of Soc. Sec. Admin.</u>,

2   533 F.3d 1155, 1162 (9th Cir. 2008).

3        For the reasons discussed above, most of the ALJ's rationale for finding Dr. Lippert's

4   opinion unpersuasive lacks merit.  The ALJ mischaracterizes plaintiff's treatment as effective and

5   less "intensive" than Dr. Lippert states.  <u>See</u> AR 27.  Although the length of a physician's

6   relationship with the plaintiff is a relevant factor in weighing their medical opinion, it is not as

7   important as supportability and consistency, which the ALJ failed to properly analyze.  <u>See</u> 20

8   C.F.R. §§ 404.1520c(c)(1)-(3).  The brevity of the treating relationship alone cannot justify an

9   RFC that discounts Dr. Lippert's recommendations, and issuing such an RFC is not a harmless

10  error.

11       4.   <u>The ALJ Did Not Improperly Act as a Standalone Medical Expert</u>

12       Plaintiff argues that having rejected the opinions of Dr. Lippert and Dr. Pham, the ALJ

13  should have further developed the record by consulting with a mental health expert or ordering a

14  psychiatric consultative examination.  ECF No. 11 at 24-25.  Plaintiff contends that by failing to

15  do so and interpreting the raw clinical evidence himself, the ALJ impermissibly served as his own

16  medical expert.  <u>Id.</u> at 25 (citing <u>Rohan v. Chater</u>, 98 F.3d 966, 970-71 (7th Cir. 1996); <u>Moon v.</u>

17  <u>Colvin</u>, 763 F.3d 718, 722 (7th Cir. 2014); <u>Balsamo v. Chater</u>, 142 F.3d 75, 81 (1st Cir. 1998);

18  <u>Kelly v. Berryhill</u>, 732 Fed. Appx. 558, 561 (9th Cir. May 1, 2018)).

19       This issue is largely moot in light of the court's finding that the Lippert and Pam opinions

20  were rejected in error and must be reconsidered on remand.  To the extent that plaintiff contends

21  the ALJ also acted as an expert or improperly failed to develop the record as to plaintiff's

22  physical limitations, the court is unpersuaded.  Plaintiff has identified no genuine ambiguity or

23  gap in the record that required supplementation.  <u>See</u> <u>Tonapetyan v. Halter</u>, 242 F.3d 1144, 1150

24  (9th Cir. 2001).  The ALJ did not act as a medical expert, but rather fulfilled his statutory duty of

25  reviewing the medical evidence to determine whether plaintiff was disabled and what his RFC

26  was.  <u>See</u> <u>Farlow v. Kijakazi</u>, 53 F.4th 485, 488 (9th Cir. 2022).  There was no error.

27  ////

28  ////

1        D.  <u>Remand for Further Proceedings</u>

2            As discussed above, the ALJ erred by discounting plaintiff's testimony as to the

3    symptoms of his mental impairments and the opinions of Dr. Pham and Dr. Lippert.  Accordingly,

4    the court is authorized "to 'revers[e] the decision of the Commissioner of Social Security, with or

5    without remanding the cause for a rehearing.'"  <u>Treichler v. Comm'r of Social Security Admin.</u>,

6    775 F.3d 1090, 1099 (9th Cir. 2014).  "[W]here the record has been developed fully and further

7    administrative proceedings would serve no useful purpose, the district court should remand for an

8    immediate award of benefits."  <u>Benecke v. Barnhart</u>, 379 F.3d 587, 593 (9th Cir. 2004).  More

9    specifically, the court should credit evidence that was rejected during the administrative process

10   and remand for an immediate award of benefits if (1) the ALJ did not provide legally sufficient

11   reasons for rejecting the evidence; (2) no outstanding issues must be resolved before a

12   determination of disability can be made; and (3) it is clear from the record that the ALJ would be

13   required to find the claimant disabled were such evidence credited. <u>Id.</u> (citing <u>Harman v. Apfel</u>,

14   211 F.3d 1172, 1178 (9th Cir. 2000), cert. denied, 531 U.S. 1038 (2000)).

15           Plaintiff does not seek remand for an immediate award of benefits, but for "further

16   development of the medical opinion evidence and reevaluation of Plaintiff's RFC."  ECF No. 11

17   at 26.  Additionally, neither party has articulated whether, upon fully crediting the improperly

18   discounted evidence, the ALJ would be compelled to find plaintiff disabled within the meaning of

19   the Act.  Further development of the record consistent with this order is necessary, and remand

20   for further proceedings is the appropriate remedy.

21                              VII.  CONCLUSION

22           For the reasons set forth above, IT IS HEREBY ORDERED that:

23           1.  Plaintiff's motion for summary judgment (ECF No. 11) is GRANTED;

24           2.  The Commissioner's cross-motion for summary judgment (ECF No. 13) is DENIED;

25           3.  The matter is REMANDED to the Commissioner for further proceedings consistent

26   with this order; and

27   ////

28   ////

4.  The Clerk of the Court shall enter judgment for the plaintiff and close this case.

DATED: May 22, 2025

ALLISON CLAIRE
UNITED STATES MAGISTRATE JUDGE